IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ALLISON TULLY,<br>42301 Guildhall Drive<br>Ashburn, VA 20148<br><br>*Plaintiff*,<br><br>v.<br><br>CASSADAY & COMPANY, INC.,<br>8180 Greensboro Drive, Suite 1180<br>McLean, VA 22102,<br><br>Serve Registered Agent:<br><br>  Rees Broome, P.C.<br>  1900 Gallows Road, Suite 700<br>  Tysons Corner, VA 22182<br><br>*Defendant*. | Civil Action No. 1:19-cv-1154<br><br>JURY TRIAL DEMANDED |

**FIRST AMENDED CIVIL COMPLAINT FOR EQUITABLE
AND MONETARY RELIEF AND DEMAND FOR JURY**

Plaintiff Allison Tully files this First Amended Complaint against Defendant Cassaday & Company, Inc. for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and the Equal Pay Act of 1963, 29 U.S.C. § 206(d) ("EPA").

**JURISDICTION AND VENUE**

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is an action arising under the laws of the United States, specifically Title VII and EPA.

2.      This Court has personal jurisdiction over Defendant Cassaday & Company Inc. because it is a Virginia corporation with its principal place of business in this judicial district.

1

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all or a substantial portion of the unlawful employment practices occurred within this judicial district.

## PARTIES

4. Tully is a citizen of the United States and is domiciled in Ashburn, Virginia.

5. Defendant Cassaday & Company Inc. is a Virginia corporation with its principal place of business in this judicial district.

## ADMINISTRATIVE EXHAUSTION

6. Tully timely filed a charge of gender discrimination against Cassaday & Company with the United States Equal Employment Opportunity Commission ("EEOC") on January 17, 2019. The EEOC issued Tully a Right to Sue letter on August 20, 2019.

## FACTUAL ALLEGATIONS

7. Tully is female and has FINRA series 7, 55, and 63 licenses.

8. In or about January 2015, Tully began working at Cassaday & Company as a Trading Administrator.

9. In or about January 2016, Cassaday & Company promoted Tully to Director of Trading and made Tully responsible for hiring, training, and supervising two traders.

10. Cassaday & Company handles financial planning, investment and wealth management, tax management, estate planning, and life transition services.

11. Stephan Cassaday is Cassaday & Company's Chairman and Chief Executive Officer.

12. Allison Felix is Cassaday & Company's Chief Operating Officer, President, and Principal.

13. Linda Stewart is Cassaday & Company's Chief Compliance Officer and Director

of Client Services.

14. Tully's compensation was based on 65 basis points, which equaled about $135,000. Tully was never given a raise during her employment, although Cassaday regularly gave raises to similarly situated male employees.

15. When female employees requested raises, Cassaday gave female employees significant resistance, whereas Cassaday often would recommend male employees be given raises without the male employees requesting raises.

16. Cassaday often made comments that men needed to be paid more because they have families to support or will have families to support one day. On one occasion, Cassaday asked Tully if Tully's husband earns more money than her, and when Tully said yes, Cassaday replied "good, that's how it should be."

17. In or about April 2016, Tully hired Chris Forney as a Trading Administrator. During Forney's 90 day review in or about July 2016, Cassaday told Tully he wanted to give Forney a salary increase to 63 basis points.

18. Thereafter, Tully requested her salary be reviewed because increasing Forney's salary to 63 basis points would mean that Tully and Forney's salaries would be nearly the same despite Tully's higher position as Forney's supervisor and her greater experience. In response Cassaday told Tully "I do not like you. You have an attitude. My name is on the door, and I can fire you."

19. During Forney's one year review in 2017, Cassaday told Tully he wanted to give Forney a raise. Tully agreed that Forney did good work but expressed concern that giving Forney a raise would mean that Forney would be earning more than Tully despite Tully being Forney's supervisor and Tully having more experience. Tully again requested her pay be

reevaluated. In response Cassaday told Tully that Forney's raise is because he is a Chartered Financial Analyst. When Tully offered to take the Chartered Financial Analyst exam, Cassaday told her "it's not about the CFA. I can do what I want." After this meeting, Cassaday met with Forney, gave Forney a salary increase, and told Forney that Cassaday foresaw giving Forney additional salary increases throughout the year.

20. In or about the first quarter of 2018, Tully reviewed with Felix her accomplishments and positive performance at Cassaday. Tully asked Felix why Tully had never received a raise or bonus, excluding the $250 bonus all employees receive, and whether there is something Tully needed to be doing that she was not doing. In response Felix glared at Tully and ordered Tully to leave Felix's office.

21. Cassaday repeatedly made inappropriate sexual comments to Tully and other female employees throughout Tully's employment. For example, Cassaday repeatedly made comments to Tully and other female employees with red hair that "I love redheads."

22. On another occasion Cassaday commented to his son while staring at Tully, "Look at Tully. Look at those legs. Doesn't she look good?"

23. Cassaday told Tully she did "a good job working out" and that "your legs go on for miles." Cassaday would also stare at Tully's rear-end as she walked by and make comments about Tully's body.

24. Cassaday also asked if Tully was interested in having Cassaday & Company sponsor her in triathlons and marathons and wear company attire, and he told Tully to design a race kit because if he designed it Tully "would be riding naked." Cassaday then winked at Tully.

25. In or about August 2016, Tully and former Director of Marketing Kristen Tischler were standing near their cars following a seminar. Cassaday approached them and told Tully and

Tischler "nice job girls" and "God, I love my redheads" while looking them up and down. Cassaday then told them, "if I did not have to get home to my wife I would take you for a ride."

26. In or around 2017, prior to Tischler leaving Cassaday & Company, Tischler advised Principal and Senior Advisor Chris Young that there are ongoing sexual harassment issues with Cassaday harassing female employees. Neither Young nor executives at Cassaday addressed or responded to Tischler's allegations.

27. At Cassaday & Company, direct orders from clients typically would go to Tully, Stewart, or Ann Wagaman. However, direct orders from clients would also occasionally be sent to traders to handle. Direct orders would also go to the advisors who would funnel them directly to the Trading Team or Wagaman or Stewart who would then send the orders to the Trading Team. Stewart told Tully this was permissible and that after 2008 traders did not need to be licensed.

28. In or about late March or early April 2018, Stewart told Tully that traders needed series 7 licenses in order to take client calls. The two traders at the time, Forney and Mike Fiorese, did not have series 7 licenses.

29. In or about late March or early April 2018, Senior Vice President Sean Gallahan had a client named Rod Narbesky, who was nervous about the handling of his assets. Gallahan asked Tully to help him get the client on board.

30. On or about April 2, 2018, Narbesky called while Tully was out of the office and the client's call was sent to Stewart. Stewart sent Narbesky's call to Forney and Fiorese to accept execution instructions, knowing that they did not have series 7 licenses.

31. Tully told Felix that, in or about the week prior to April 2, 2018, Stewart told Tully that traders cannot accept execution instructions without series 7 licenses.

32. When Tully returned in early April 2018, she met with Stewart and questioned whether Stewart was up to date on the relevant rules and regulations because Stewart previously told her that traders did not need to be licensed after 2008. Stewart clarified that traders only need to be licensed if making discretionary decisions, but at Cassaday & Company the traders only put numbers in the system which then spits out the trades so they do not need to be licensed. Tully told Stewart that this was not accurate and that the traders are making discretionary decisions.

33. Stewart continued to send client calls to the traders even though they were not licensed. Tully told Forney and Fiorese not to make these types of trades anymore. Narbesky continued to directly contact the traders about trades.

34. On or about April 6, 2018, Narbesky called and emailed Forney instructing him to make a trade. Tully met with Gallahan to explain why the Traders could not operate in this manner any further. Gallahan understood and agreed to stop. After this meeting, Gallahan sent out a memorandum denying the agreement he and Tully had reached. Tully, Felix, and Gallahan met to discuss the contradicting orders. Tully raised her voice at Gallahan, questioning his honesty and expressed her increased concern of the evolving complexity of the violations. On or about April 13, 2018, Tully met with Felix to discuss Tully raising her voice at Gallahan. Tully explained to Felix that the ongoing issue was that Forney and Fiorese were asked to make trades even though they did not have the requisite licenses and that she believed Gallahan was trying to circumvent her in order to get trades through when Forney and Fiorese were not licensed.

35. Felix advised that she understood that the issue between Tully and Gallahan was that Tully told Forney and Fiorese not to handle trades for Narbesky because Narbesky was rude. However, Tully explained that Forney and Fiorese did not have the licensing required to take

direct client calls and therefore the practice of sending calls to them needed to stop. Tully also advised Felix that the issue of whether Forney and Fiorese could trade is in a grey area of Security Exchange Commission guidelines but if the trades went badly the clients could request their money back and also sue Cassaday & Company pursuant to their agreements with the company. In response, Felix told Tully that the client does not know about it, and Tully replied that she knew about it and could tell the SEC what happened. Felix responded that "no one needs to know."

36. In or about mid-May 2018, Forney and Fiorese told Tully that as part of an upcoming audit by Royal Alliance, Cassaday's broker-dealer, Stewart instructed them to incorrectly and inaccurately describe their roles as non-discretionary wire operators on their business activity forms and that they were not comfortable misrepresenting their roles. Forney and Fiorese stated that Stewart instructed Forney and Fiorese to describe their roles are wire operators "because they aren't licensed and we'll get in trouble for that."

37. On or about May 10 and 14, 2018, Tully met with Stewart and told Stewart that Cassaday & Company should be forthcoming with the audit team. Tully advised Stewart that she was uncomfortable with Forney and Fiorese inaccurately describing or lying about their roles on their business activity forms. Tully then proposed that Cassaday & Company tell the auditors that Forney and Fiorese were not licensed but since learning that they need to be licensed Cassaday & Company has taken steps to remedy the issue by having Forney and Fiorese sign up to take the licensing exams. Stewart responded that she disagreed.

38. In or about late May 2018, Royal Alliance conducted its audit of Cassaday & Company, and Tully overheard Stewart incorrectly describe to the auditors that Forney and Fiorese were wire operators during the audit. Thereafter Tully advised Forney and Fiorese to

7

stop trading, that they would not be authorized to trade until they obtained their Series 7 license, and that Tully would handle all order flow and management until that time.

39. On or about May 30, 2018, Tully emailed Cassaday, Stewart, and Felix and reiterated that the traders needed to be licensed and advised that Forney and Fiorese would cease trading until they obtained their series 7 licenses. Tully then met with Cassaday, Stewart, and Felix to explain the licensing issue. Cassaday said that he was not happy that Tully told the traders to stop trading and instructed Tully to have the traders continue trading.

40. On or about June 5, 2018, Tully told Cassaday there was a gray area concerning whether the traders needed to be licensed because they were making discretionary decisions. Moreover Tully told Cassaday that Royal Alliance advised Stewart that the traders needed to be licensed. Cassaday disagreed that the traders needed to be licensed and told Tully that she needed to do what she was told and that she was not a supervisor.

41. On or about June 8, 2018, Tully met with Cassaday and told him that Stewart was not being honest about compliance issues. In response, Cassaday told Tully that her behavior was concerning and that Stewart and Felix were asking to fire her and that Tully was making him so angry he was about to fire her.

42. On or about June 8, 2018, Cassaday, Felix, and Tully had a telephone call with John Grady, an attorney. Grady explained that based on how Cassaday & Company's traders were trading that they should have series 7 licenses and that any individual overseeing trading needs a series 24 license.

43. On or about June 9, 2018, Cassaday emailed Royal Alliance in response to Royal Alliance requesting additional information as part of the audit. Cassaday inaccurately described the June 8, 2018 call with Grady by stating "our outside counsel has affirmed that, although a

8

gray area, they believe we are not in violation of FINRA regulations." Cassaday also stated in his email to Royal Alliance that all trades would be completed by registered employees until the traders could get their series 7 licenses.

44. After sending the June 9, 2018 email to Royal Alliance, Cassaday instructed Tully to reinstate Forney and Fiorese and have them continue trading. Cassaday then told Tully that Tully no longer had any director responsibilities and that Stewart was responsible for everything. Tully then offered to sit for the next series 24 license in order to get the requisite license necessary to oversee trading, but Cassaday told her no.

45. On or about June 11, 2018, Tully met with Cassaday and Felix and advised that she had been asked to do things at Cassaday & Company that she was not comfortable with. Tully also reported that she had been "asked to look the other way" after raising compliance concerns about licensing, and as a result she believed it was best to develop a transition plan to allow her to leave Cassaday & Company.

46. Tully also reported that when she raised issues about the traders not being licensed Stewart instructed the traders to misrepresent their roles on their business activity descriptions so that Cassaday & Company would not get in trouble for having unlicensed traders trading. In response, Cassaday told Tully it was best if she resigned because the "relationship is broken" and because Tully had a bad attitude.

47. On or about June 11, 2018, Tully submitted a letter to Cassaday and Felix that stated in part:

> When I raised concern of potential regulatory and compliance issues, I and my traders were asked to do and not do things we were not comfortable with. During a meeting on June 8, 2018, Steve [Cassaday] explained that a case had been built against me and that he and others at this firm (including Allison [Felix] and Linda [Stewart]) wanted me dismissed. Steve explained that, despite my title, I am not a supervisor or a manger and do not have the authority to make the decision to halt

the trading activity of Mike Fiorese and Chris Forney until they became licensed after passing the Series 7. Steve further stated that because Linda [Stewart] is licensed with the Series 24, she has oversight over the Trading Department. I expressed to Steve [Cassaday] that [I] believed that this is response and retaliation for raising compliance and regulatory concerns.

48. Three days later, on or about June 14, 2018, Cassaday gave Tully a letter proposing she resign. The next day Cassaday asked Tully if she discussed her June 11, 2018 letter with anyone.

49. On or about June 15, 2018, Cassaday & Company terminated Tully's employment, removed her computer access, and walked her out of the building. Cassaday claimed that Tully resigned.

50. As the result of Defendant's illegal actions, Tully has sustained mental anguish, economic damages, and damage to her reputation. She will continue to suffer damages into the future.

## COUNT I
### Title VII
### 42 U.S.C. § 2000e, *et seq*.
### Discrimination Based on Gender

51. Tully incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

52. Tully is an "employee" as the term is defined at 42 U.S.C. § 2000e(f).

53. Cassaday & Company is an "employer" as the term is defined at 42 U.S.C. § 2000e(b).

54. Cassaday & Company violated 42 U.S.C. § 2000e, *et seq.*, by terminating Tully's employment on June 14, 2018 and by not giving Tully comparable salary increases and bonuses to male employees.

55. Cassaday & Company unlawfully discriminated against Tully by treating her

more harshly and less favorably than it treated male employees.

56. The reasons for terminating Tully and for not giving her salary increases and bonuses are pretext for unlawful discrimination.

57. Tully has exhausted her administrative remedies under Title VII.

58. For Cassaday & Company's unlawful discrimination against Tully, pursuant to Title VII, Tully is entitled to general and special damages, economic damages including front and back pay, reinstatement, promotion, compensatory damages, reasonable attorney's fees to be paid by Cassaday & Company, as well as her costs and any other legal and/or equitable relief that this Court deems appropriate.

## COUNT II
### Title VII
### 42 U.S.C. § 2000e, *et seq*.
### Hostile Work Environment Sexual Harassment

59. Tully incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

60. Cassaday made repeated sexual comments to Tully throughout her employment suggesting that he wanted to engage in a sexual relationship with her.

61. Cassaday made repeated sexual comments to other female employees in Tully's presence.

62. Cassaday's sexual comments and advances were unwelcome.

63. Cassaday's conduct towards Tully was severe, pervasive, and altered the terms and conditions of Tully's employment.

64. Cassaday & Company was aware of Cassaday's sexual harassment of female employees, but Cassaday & Company took no action to address Cassaday's behavior.

65. Tully has exhausted her administrative remedies under Title VII.

66. For Cassaday & Company's hostile work environment against Tully, pursuant to Title VII, Tully is entitled to general and special damages, economic damages including front and back pay, reinstatement, promotion, compensatory damages, reasonable attorney's fees to be paid by Cassaday & Company, as well as her costs and any other legal and/or equitable relief that this Court deems appropriate.

**COUNT III**
**Title VII**
**42 U.S.C. § 2000e, et seq.**
**Retaliation**

67. Tully incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

68. Cassaday & Company violated 42 U.S.C. § 2000e, *et seq.*, by retaliating against Tully by terminating her employment for engaging in protected conduct when she requested her salary be reevaluated based on male employees receiving raises.

69. The reasons for terminating Tully are pretext for unlawful retaliation.

70. Tully has exhausted her administrative remedies under Title VII.

71. For Cassaday & Company's unlawful retaliation against Tully, pursuant to Title VII, Tully is entitled to general and special damages, economic damages including front and back pay, reinstatement, promotion, compensatory damages, reasonable attorney's fees to be paid by Cassaday & Company, as well as her costs and any other legal and/or equitable relief that this Court deems appropriate.

# COUNT IV
## Equal Pay Act
## 29 U.S.C. § 206(d)
## Unequal Pay

72. Tully incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

73. Tully was an "employee" as the term is defined in 29 U.S.C. § 203(e)(2)(ii).

74. Cassaday & Company is an "employer" as the term is defined at 29 U.S.C. § 203(d).

75. Tully performed work that required at least equal, if not more, skills, effort, and responsibility under similar working condition as those of her male colleagues.

76. Cassaday & Company set Tully's pay at a level that was below her male colleagues who had skills, effort, and responsibility under similar working conditions.

77. For Cassaday & Company's unlawful and unequal pay in violation of the EPA, Tully is entitled to economic damages, liquidated damages, reasonable attorney's fees and costs, and any other relief that this Court deems just and equitable.

## PRAYER FOR RELIEF

Based on the foregoing, Tully respectfully requests that the Court enter judgment in her favor and award to her the following relief:

a. Reinstatement or, in lieu thereof, full front pay, stock options and benefits;

b. Economic damages for lost compensation and damages to Tully's career;

c. Compensatory damages, including but not limited to pain and suffering, emotional distress and reputational damage;

d. Reasonable costs and experts' and attorneys' fees; and

e. Any other such relief that the Court may deem just and equitable.

## DEMAND FOR JURY TRIAL

Tully requests a trial by jury for any and all issues proper to be so tried.

Respectfully submitted,

R. Scott Oswald, Esq.
Virginia Bar No. 41770
Kellee Boulais Kruse, Esq.
Virginia Bar No. 78710
The Employment Law Group, P.C.
888 17th Street, NW, 9th Floor
Washington, D.C. 20006
(202) 261-2838
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
kkruse@employmentlawgroup.com
*Attorneys for Plaintiff*