**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **ALLISON TULLY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | Civil Action No. 1:19-cv-01154-LO-JFA |
| ) | |
| **CASSADAY & COMPANY, INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT[1]**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56,

Defendant Cassaday & Company, Inc., ("Cassaday & Company" or "Defendant"), through

counsel, hereby moves for dismissal with prejudice of Plaintiff Allison Tully's ("Plaintiff" or

"Tully") lawsuit in its entirety.  Defendant's grounds in support are as follows.

## I.    SUMMARY

Plaintiff claims that she was denied equal pay due to her gender and terminated from her

job for complaining of pay disparity based on gender.  Plaintiff also claims she was subjected to

a hostile work environment.  She alleges that Defendant's actions violated the Equal Pay Act

("EPA"), 29 U.S.C. §§ 206(d)(1), and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. § 2000e, *et seq*.  Based on the undisputed material facts, Plaintiff's allegations are

---

[1] Defendant files an Appendix of Exhibits with this Memorandum.  In this Memorandum, Defendant will refer to the numbered paragraphs of its Statement of Material Facts not in Dispute (Section II, below) as "Def. Facts ¶ __." and to Exhibits in the Appendix as "Ex. __." Excerpts of witness deposition transcripts and declarations are also included in the Appendix, and depositions are referred to by the last name of the witness and a page and line cite, e.g., "Tully Tr. __", declarations are referred to by last name of the witness and a paragraph cite, e.g., "Felix Decl. ¶ __", and the Amended Complaint [ECF 4] is referred to as "Am. Compl.__."

unfounded. Plaintiff's claims for pay disparity under the EPA and Title VII do not meet the elements for a cause of action because no male was paid more than she for comparable work. Moreover, the record documents that Cassaday & Company treats males and females no differently. As to retaliation, Plaintiff cannot show that she engaged in protected activity because she admits she never complained of pay disparity due to gender. Regardless, she cannot show that her employment was terminated "but for" the alleged discriminatory animus—she admits she resigned over a dispute unrelated to discrimination. Plaintiff's claim for discrimination based on being subjected to a hostile work environment fails because the facts of record document that she was not subjected to severe and pervasive working conditions, and because no discriminatory animus is documented or may be inferred. Even if Plaintiff could make out a *prima facie* case of harassment, her claim fails because, on the undisputed facts of the case, Defendant is protected by the *Faragher-Ellerth* defense.

For these reasons, as explained further below, Cassaday & Company respectfully request that this Court grant summary judgment and dismiss Plaintiff's action with prejudice.

## II.   <u>MATERIAL FACTS NOT IN DISPUTE</u>

**<u>General Background</u>**

1.     Cassaday & Company is an independent financial advisory firm that provides comprehensive financial planning and investment management solutions for its clients. Ex. 1, Agreed Stipulations of the Parties ("Stip. of the Parties"), ¶ 1.

2.     Cassaday & Company is a registered investment advisor. It is based in McLean, Virginia. *Id.* ¶ 1.

3.     Defendant Cassaday & Company hired Tully as the firm's Trading Administrator in January 2015. *Id.* ¶ 2.

4.     Tully is a woman. *Id.* ¶ 3.

5.     Cassaday & Company promoted Tully to Director of Trading in January 2016. *Id.* ¶ 4.

6.     Stephan Cassaday ("Cassaday") is Cassaday & Company's Chairman and Chief Executive. *Id.* ¶ 5.

7.     Allison Felix ("Felix") is Cassaday & Company's Chief Operating Officer, President and a Principal. *Id.* ¶ 6.

8.     Linda Stewart ("Stewart") is Cassaday & Company's Chief Compliance Officer and a Director of Client Services. *Id.* ¶ 7.

9.     Tully holds a Bachelor of Science degree in finance. *Id.* Ex. 2, Excerpts of Deposition of Allison Tully ("Tully Tr.") 10:9-13.

10.     Tully also obtained the Financial Industry Regulatory Authority (FINRA) Series 7, 55, and 63 licenses. Tully Tr. 10: 14-22.

11.     Tully's employment with Cassaday & Company ended on June 14, 2018. Stip. of the Parties ¶ 8.

**Tully's Job Responsibilities and Compensation History**

12.     On December 30, 2014, Tully received a job offer to join Cassaday & Company as its Trading Administrator, then a new position. She was offered the salary she requested—$████. Ex. 3, Felix Decl. ¶ 5; Ex. A (Tully's Job Application)].

13.     During the first 60-120 days of employment, depending on the date of hire, a new employee of Cassaday & Company receives his or her agreed base salary. If the employee performs successfully during this first cycle, the flat base salary is then reduced to $████. In addition to the reduced base salary, the employee is compensated with a percentage of the firm's gross commissions and fees (gross revenue) earned from clients' assets under management measured over a look-back period at each pay period , called basis points ("BPs").

Felix Decl. ¶ 8.[2]  The initial award of BPs is set so that the employee's total salary at that point

will match or slightly exceed the flat base salary agreed to at the time of hire. *Id.*

14.     Stephan Cassaday has the principal say and is the final arbiter for compensation

decisions, both as to starting pay and any BP award or change.   He takes his decisions in

consultation with Allison Felix and with input from others, such as an employee's manager.  Ex.

4, Excerpts of Deposition of Stephan Cassaday ("Cassaday Tr."), 15: 5-17; 16: 1-9; Felix Decl.

¶ 9.  He set Tully's award of BPs at ▇.  *See* Am. Compl. ¶14.

15.     When employees are offered BP-based compensation, they are advised that the

firm's objective is to increase gross revenue earned from assets under management, thereby

increasing the value of BPs.  While this is not a promise, employees are given to understand that

if the firm meets its objective then employees automatically share in the growth of the gross

revenue and, in effect, get a raise.  Felix Decl. ¶ 10.

16.     During Tully's tenure with Cassaday & Company, its gross commissions/fees

earned from assets under management rose each year, thereby increasing the value of BPs. Felix

Decl. ¶ 12.

17.     In addition to the growth in compensation that employees may receive from

growth in firm revenue if Cassaday & Company is successful, employees also know that they

can personally "make a case" to Stephan Cassaday as to why the value they bring to the firm, or

some other factor, warrants an increase in their BP award.  Felix Decl. ¶ 13.  *See, e.g.*, Tully Tr.

80: 1-14; Ex. 5, Declaration of Sarah Mouser ("Mouser Decl.") ¶ 8; Ex. 6, Declaration of

Brandon Butler ("Butler Decl.") ¶¶ 7-8.

18.     Tully's compensation for 2015 was $▇▇▇▇. Felix Decl. ¶ 16, Ex. B (Tully's

---

[2] This BP compensation structure is optional; a new employee may choose to go with a straight salary rather than participate in firm earnings.  Most, like Tully, choose BPs.  Felix Decl. ¶ 11.

IRS form W-2s for 2015-2018).

19.    For 2016, Tully's annual compensation increased to $████. *Id.*

20.    For 2017, Tully's annual compensation further increased to $████. *Id.*

21.    By the time Tully left Cassaday & Company in June 2018, her compensation for the first six months of the year was $████. *Id.*

22.    Tully admits that she was on track to earn around $████ for 2018 had she remained at Cassaday & Company. Tully Tr. 114:1-2.

23.    According to Tully, she helped another female Director, Sarah Mouser, "prepare a case" for Mouser to present to Cassaday as to why Mouser should receive an increase in her BPs. Tully Tr. 80: 1-4.

24.    In or around June, 2017, Tully met with Beth Saunders, a consultant that Tully understood to be working with Cassaday & Company to help reorganize the firm and find areas for process improvement, to get Saunders' advice about "potentially a different approach to presenting [Tully's] case for a salary review and potential increase to the salary." Tully Tr. 75: 19-22; 76: 1-11; 78: 18-22.

25.    Tully recalled that Saunders gave her advice for a way to present her case but Saunders said she "wasn't going to fight the fight" and that it was up to Tully to do so, which Tully agreed with. Tully Tr. 76: 18-22; 77: 1-4.

26.    Despite her help for Mouser and her conversation with Saunders, Tully admits that she never put together a case for herself to present to Cassaday as to why she should receive an increase to her BP award. Tully Tr. 80: 12-14.

27.    Tully also admits that while she was employed at Cassaday & Company, she never made a complaint about gender discrimination in pay. Tully Tr. 74: 3-6.

28.    When Tully first joined Cassaday & Company in 2015, the firm did not have a

separate trading department and "Trading Administrator" was a new position. Felix Decl. ¶ 6. Tully then reported to the directors of two different departments. Ex. 7, Excerpts of Deposition of Corporate Designee ("Corp. Tr.") 83:15-22. They were Kay Paradiso, Director of Investment Management, who, at that time, oversaw Cassaday & Company's trading operations, and Brandon Butler, the firm's Director of Research. Corp. Tr. 84:1-12.

29.     By the end of Tully's first year of employment, firm management determined that the trading function overseen by Tully was ready to launch as a separate department, and Tully was named Director of Trading. Felix Decl. ¶ 7; Am. Compl. ¶ 9.

30.     As Cassaday & Company's first Trading Administrator and then its Director of Trading, Tully's job responsibilities included launching a new department and overseeing the firm's trading desk, leading a team of traders in managing and executing client portfolios, executing trades in open and closed-end mutual funds, ETFs, and fixed income and single stock equities, working with trading partners to ensure best execution while minimizing market impact, establishing a system of checks and balances to automate trade review, overseeing the career development of the trading team, and leading the team's market research to ensure that proper trade decisions are made with all available information. *See* Ex. 8 (Tully's Resume).

31.     While Tully was Director of Trading, Cassaday & Company hired two Trading Administrators who reported to her operationally. Am. Compl. ¶¶ 9, 17, 28. Chris Forney was hired effective April 2016 and Mike Fiorese was hired effective March 2018. *Id*.; Ex. 9, Excerpts of Deposition of Mike Fiorese ("Fiorese Tr.") 11:20-21.

32.     Tully and members of her team had similar day to day trading tasks and portfolio management responsibilities, but Tully took on the additional executive, administrative, and managerial responsibilities as Director. Further, Tully took on the particularly complex and difficult trades rather than her team members due to her more extensive trading experience. Ex.

10, Plaintiff's Supplemental Interrogatory Response to Interrogatory No. 22.

## The Compensation Histories of Other Directors Compensated Similar to Tully in and around Tully's Tenure

33.     As of January 15, 2014, and continuing until after Tully left employment, her first co-manager, Director of Investment Management Kay Paradiso, was also compensated at ■ BPs. Felix Decl. ¶ 21, Ex. C.

34.     As of April 12, 2013, Director of Research Brandon Butler, Tully's other initial co-manager, converted to ■ BPs for his compensation. Felix Decl. ¶ 22, Ex. D. On July 23, 2013, Butler's award of BPs was increased to ■ BPs. Felix Decl. ¶ 23, Ex. E.[3]

35.     Butler received no other basis point increase during his three-year tenure at Cassaday & Company. He left the firm in March 2016.  Felix Decl. ¶ 24; Butler Decl. ¶¶ 1, 9.

36.     Chad Cassaday is Cassaday & Company's Director of Information Technology. Felix Decl. ¶ 25.[4]

37.     As of March 2014, and continuing until after Tully left employment, Chad Cassaday was also compensated at ■ BPs.  Felix Decl. ¶ 26, Ex. F.

38.     Sarah Mouser is Cassaday & Company's Director of Financial Planning. Felix Decl. ¶ 27.

39.     Effective November 1, 2014, Mouser received an initial award of ■ BPs. Felix Decl. ¶ 28, Ex. G.

---

[3] This increase came about because Butler's former employer offered him a $■ raise to stay rather than leave for Cassaday & Company, a proposal that would have paid him more than Cassaday's offer.  Butler told Stephan Cassaday he would honor his agreement to join Cassaday & Company but asked that the pay increase he was forgoing be taken into account.  Cassaday said he would not increase the starting salary offer but agreed to consider a future adjustment. The increase in July, along with firm growth, made up the difference.  *See* Butler Decl. at ¶¶ 7-8.

[4] Chad Cassaday's full name will be used in order to distinguish him from his father, Stephan Cassaday.

40.     During Tully's tenure, Mouser successfully "made her case" for an increase in BPs to Stephan Cassady and effective August 1, 2016, her compensation rate was increased to ▮ BPs. Felix Decl. ¶ 29, Ex. H; Mouser Decl. ¶¶ 8-9.

41.     Not long after Tully exited the company, in or around October 2018, Mouser again met with Cassaday to explain her case for another increase to her BPs, again was successful, and was increased to ▮ BPs effective November 1, 2018. Felix Decl. ¶ 30, Ex. I; Mouser Decl. ¶ 8.

42.     Michelle Montpetit was a financial advisor at Cassaday & Company who twice received an increase in her BPs after her initial BP award. Ex. 11, Excerpts of Deposition of Michelle Montpetit ("Montpetit Tr.") 21: 21-25; 23: 25-24: 5.[5]

**The Compensation of More Highly Paid Directors During Tully's Tenure**

43.     In March 2016, Cassaday & Company hired Stephen McFeely as its Director of Research at an annual salary of $▮. Felix Decl. ¶ 31, Ex. J.

44.     Commencing August 1, 2016, McFeely was compensated at ▮ BPs. Felix Decl. ¶ 32, Ex. K.

45.     McFeely's compensation did not change further following this 90-day review. Instead, only the value of his award of ▮ BPs increased. Felix Decl. ¶ 33.

46.     For 2017, McFeely's compensation was $▮. Felix Decl. ¶ 34, Ex. L (McFeely IRS Form W-2).

47.     For 2018, McFeely's compensation was $▮. Felix Decl. ¶ 35, Ex. M (McFeely IRS Form W-2).

---

[5] While Montpetit was not a department director, her circumstances are included because she was identified by Plaintiff as an individual whom she expects to testify in support of her claims of discrimination due to gender.

48.     McFeely was the highest paid male director at Cassaday & Company in 2017 and 2018 but he still earned less than three female directors. Felix Decl. ¶ 36.

49.     Carmen Bississo is Cassaday & Company's Director of Advanced Strategies. Felix Decl. ¶ 37.

50.     For 2017, Bississo's compensation was $███████ and for 2018, her compensation was $███████. Felix Decl. ¶ 38, Ex. N (Bississo IRS Forms W-2).

51.     Linda Stewart is Cassaday & Company's Chief Compliance Officer & Director of Client Services. Felix Decl. ¶ 39.

52.     For 2017, Stewart's compensation was $███████ and for 2018, her compensation was $███████. Felix Decl. ¶ 40, Ex. O (Stewart IRS Forms W-2).

53.     Ann Wagaman is Cassaday & Company's Director of Client Services. Felix Decl. ¶ 41.

54.     For 2017, Wagaman's compensation was $███████ and for 2018, her compensation was $███████. Felix Decl. ¶ 42, Ex. P (Wagaman IRS Forms W-2).

**Tully's Alleged Comparators**

55.     Tully states that the three male employees she identifies as comparators for purposes of her claim in this case of pay disparity due to gender are Stephen McFeely, Chris Forney, and Mike Fiorese. She claims that Forney and Fiorese were paid "a comparable salary" while she was paid less than McFeely. Tully Tr. 83: 5-16. *See also* Ex. 12, Plaintiff's Answers to Interrogatories 15, 20 and 21.

**Stephen McFeely Is Not a Comparator**

56.     As Director of Research, McFeely was responsible for the day-to-day management of Cassaday & Company's investment portfolios. He reported to Cassaday and the firm's Investment Policy Committee. He was expected to measure performance and risk

standards for the portfolios and to be involved in researching macro and micro strategies with an eye toward formulating policy on selections, allocations, special/tactical sleeve situations, relative valuations and macro view. He was also expected to play a key role in the firm's Strategic Investment Counsel and the Investment Policy Committee, preparing presentations based on economic data, analyzing macro trends and providing cyclical market commentary, often leading investment discussions. McFeely was also expected to act as a generalist on all asset classes but be responsible for specializing in a specific asset class. A core responsibility of his position was to enhance the firm's research capabilities. He was also expected to play a primary role in assisting advisors in addressing client needs and executing client deliverables for the department. Felix Decl. ¶ 44, Ex. Q (Director of Research job description).

57. McFeely has over 20 years of portfolio management experience and an MBA in finance from George Mason University. He also has an undergraduate degree in business from the University of Maryland and is a Chartered Financial Analyst ("CFA"). Felix Decl. ¶ 45, Ex. R (McFeely's firm biography and his LinkedIn biography as of 6-15-2020).

58. Tully admitted that McFeely was better credentialed than she for working at a company whose services focuses on wealth management and investment advisory services because McFeely has the CFA designation and holds an MBA degree. Tully Tr. 124: 3-16.

59. Tully admitted that she knew McFeely had more industry experience than her from prior to their time working together at a different institution, and in fact, he has approximately 12 more years of experience. Tully Tr. 124: 17-22; 125: 1-9.

60. Tully admitted that she and McFeely did different jobs at Cassaday & Company. Tully Tr. 126: 3-5.

61. Tully admitted that McFeely's job at Cassaday & Company was not "virtually identical" to hers. Tully Tr. 127: 1-3.

62.     Tully admitted that the functions of her and McFeely's jobs at Cassaday & Company were not similar in *all* respects. Tully Tr. 127: 21-22; 128: 4-6.

63.     Tully admits that her experience would not be a good fit for McFeely's role. Tully Tr. 129: 17-21.

64.     Tully testified that McFeely's experience and preference at the time he joined the company was on the "research side" while hers was on the "trading side." Tully Tr. 130: 3-11.

65.     Stephan Cassaday decided Tully's pay or rate of compensation, both starting and award of BPs.  Her compensation was determined based on factors that included her previous compensation and the compensation of the directors of the firm who would be overseeing her role/training her, supporting the establishment of a new department and how it would integrate with other operations and responsibilities.  This meant there was no precedent because there was no one comparable employee with the same job description and duties during Tully's tenure or as her predecessor. Ex. 13, Defendant's Answer to Interrogatory No. 11 of Plaintiff's First Set of Interrogatories to Defendant.

66.     Stephan Cassaday decided McFeely's pay or rate of compensation, both starting and award of BPs.  His compensation was determined based on factors that included his previous compensation, years of analogous experience, and education/designations.  McFeely's position was created for his hiring; this meant there was no precedent because there was no one comparable employee with same job description during his tenure or as a predecessor.  Ex. 14, Defendant's Answer to Interrogatory No. 3 of Plaintiff's Second Set of Interrogatories.

**Chris Forney's and Mike Fiorese's Compensation Histories Show They Were Paid Less than Tully, so They Cannot Be Comparators**

67.     Chris Forney's annual salary upon commencing his employment in April 2016 was $█████. Felix Decl. ¶ 47, Ex. S (Felix email to Forney after his 90-day review advising him

that his starting salary would change to BPs).

68.     Commencing August 1, 2016, Forney was compensated at ▮ BPs. Felix Decl. ¶ 48, Ex. S.

69.     As of April 15, 2017, Forney's compensation rate was increased to ▮ BPs, and remained there for the duration of Tully's employment. Felix Decl. ¶ 49, Ex. T (Felix email to Forney advising him of the increase to his award of BPs).

70.     Forney was always paid less than Tully during the time they worked together at Cassaday & Company.  *Id*.; Tully Tr. 86: 1-3; 90: 8-14; 105:1-22; 106:1-6; 106:16-20.

71.     Mike Fiorese's annual salary upon commencing his employment in March 2018 was $▮. Felix Decl. ¶ 50, Ex. U (Kelly Wagaman email to Fiorese after his 90-day review advising him that his starting salary would change to BPs).

72.     As of August 1, 2018, Fiorese was compensated at ▮ BPs. Felix Decl. ¶ 51, Ex. U.

73.     Fiorese was always paid less than Tully during the time they worked together at Cassaday & Company.  Tully Tr. 117:8-12; 113:10-22, 114:1-9.

74.     Fiorese received a lower award of BPs (▮) when he commenced employment as a Trading Administrator than Tully received when she commenced employment as a Trading Administrator (▮).  Felix Decl. ¶ 52.

75.     Tully admits that by the time Fiorese was hired 3 1/3 years after her, salaries across the board had increased, and Fiorese was then paid approximately 35% less than she was paid. Tully Tr. 113:10-22, 114:1-9; 115:4-7.

**Tully Did Not Complain of Pay Disparity Due to Gender**

76.     Tully alleges that in one meeting she had with Cassaday, she questioned Forney's pay compared to hers but admits she never told Cassaday she was being discriminated against or

raised gender as an issue with respect to pay. Tully Tr. 71: 17-22; 72: 1-18.

77.     Tully agrees that it is her practice to document important matters of controversy with emails. Tully Tr. 72: 19-22; 73: 1-4.

78.     Nevertheless, Tully admits she never wrote an email to Cassaday, Felix, or any principal linking her pay and gender discrimination. Tully Tr. 73: 5-11.

79.     Tully also admits she never made such a complaint during her employment. Tully Tr. 73: 12-17.

80.     Tully admits that her EEOC charge does not include an allegation that she told Cassaday or Felix that she was discriminated against due to gender. Tully Tr. 61: 3-14.

81.     Tully agrees that if she had made such a complaint, it would have been important to report that to the EEOC.  Tully Tr. 61: 15-18.

**Cassaday's Alleged Statements Regarding the Compensation of Certain Male Employees**[6]

82.     Tully claims that Cassaday said, in her presence, that he wanted to pay certain male employees more because they had or would have families to support. Tully Tr. 131:3-6.

83.     Tully claims that the specific men Cassaday mentioned were Forney, Chris Cassaday, and Steve Ulrich. Tully Tr. 131:12-22; 132:1-3.

84.     Tully also claims that Cassaday also spoke about how much the firm's investment advisors made and that he was happy because that set them up to support their families.  At the time, all of the firm's investment advisors were male. Tully Tr. 135: 5-9.

85.     However, Tully admits that she does not know whether Cassaday would have felt differently about female investment advisors. Tully Tr. 135: 10-12.

86.     Tully also does not know if Cassaday's stated interest in paying Forney, Chris

---

[6] Cassaday denies making the statements reported by Tully.  Ex. 15, Declaration of Stephan Cassaday ("Cassaday Decl.") ¶¶ 8-9. Defendant recognizes that Tully's allegations that he did must be taken as true for purposes of this motion.

Cassaday, and Ulrich more meant that doing so would result in them being paid more than her. Tully Tr. 137:12-18.

**Tully Never Complained of Sexual Harassment During Her Employment**

87.     Tully admits that she never reported any of the comments she now alleges that Stephan Cassaday made to her or others to any Cassaday & Company managers during her employment. Tully Tr. 138:18-22; 139: 1-2.

88.     Cassaday & Company has a "Prohibition Against Sexual and Other Unlawful Harassment" Policy, that includes a complaint reporting procedure. Felix Decl. ¶ 54, Ex. V.  It is provided to all employees during onboarding.  Corp. Tr. 17: 5-12.

89.     Tully signed an acknowledgement of receipt of the firm's Policy Manual on December 31, 2014. Tully Tr. 141: 4-11; Ex. 16, Signed acknowledgment.

90.     Tully also agreed that the acknowledgment form stated she was responsible for reviewing the Manual. Tully confirmed that she did review it and understood what she read. Tully Tr. 141:12-19; 142: 1-3.

91.     Tully was aware of the open door policy that Cassaday and Felix had at the firm and reminded her own staff of it on August 24, 2016. Tully Tr. 165: 8-22; 166: 1-6; Ex. 17, Tully email to her staff.

92.     Tully testified that, in 2016 or 2017, she offered to file a complaint on behalf of a Trading Administrator, Flora Yu, to Felix and Cassaday regarding an alleged sexually demeaning statement by Cassaday. Tully Tr. 139: 3-17.[7]

---

[7] Flora Yu denies Cassaday made an offensive statement to her.  *See* Ex. 18, Declaration of Jin Flora Yu ("Yu Decl.") ¶ 5.

**Even if Stephan Cassaday Made the Comments Tully Alleges, They Do Not Amount to a Hostile Work Environment[8]**

93.     Tully admits that she never told Cassaday she was offended by something he said or did. Tully Tr. 153: 7-9.

94.     Tully admits that none of what she described regarding Cassaday's alleged behavior and comments was physically threatening to her. She claims, instead, that the only time she felt physically threatened was "when she was terminated and he threatened her if she took legal action." Tully Tr. 152: 1-8.

95.     Tully stated that the most offensive comment Cassaday ever made to her was when, after a prospective-client dinner seminar, he told her and Kristen Tischler, the firm's former Director of Marketing & Communications, he wanted to "take them for a ride" in his car. Tully Tr. 142:8-22; 143: 1-2.

96.     Tully claims this comment was "lewd" and "made her uncomfortable." Tully Tr. 143: 1-2.

97.     Tully claims Cassaday stroked her hair one time, but she does not recall when. Tully Tr. 151: 11-20.

98.     Tully considers the comment Cassaday made after the prospective-client dinner seminar and Cassaday touching her hair, "larger incidents" than the other ones she claims she experienced. Tully Tr. 153: 2-6.

99.     Tully claims that other statements Cassaday made which offended her were the following:

- Cassaday would frequently comment on her looks and legs.

---

[8] Cassaday denies the incidents reported by Tully or, to the extent they did occur such as saying he "loves redheads," that he had any lewd or sexual intent. Cassaday Decl. ¶¶ 8, 10. Defendant recognizes that Tully's allegations must be taken as true for purposes of this motion.

- At times, Cassaday would ask Tully to spin around in order for Cassaday to look at her hair.

- Cassaday would compliment Tully about her fitness and how "good [she] looked" and, at times, Cassaday stopped other employees to have them take a look at her, too.

- Cassaday told Tully that if she was interested, the company would sponsor her in marathons and triathlons and she should design her own race kit because if he designed it she would be riding naked.

Am. Compl. 22-24; Tully Tr. 143: 22; 144: 1-7.

100.    Tully also claims that there was one time they were in a hallway together and Cassaday was behind her. She stopped and turned, thinking maybe Cassaday wanted to talk about business but he told her "no" that he wanted to see her. Tully claims that Cassaday told Tully to "keep walking with those long legs and heels." Tully Tr. 148: 10-15.

101.    Tully agrees that commenting on athleticism and working out is not offensive in the proper context. Tully Tr. 163: 1-15.

102.    Tully testified that if others heard Cassaday's comments as compliments, then it was a matter of perception. Her perception was that Cassaday's comments were sexual in nature and lewd. Tully Tr. 155: 9-22; 156: 1-4.[9]

103.    Tully also claims that, after a year at the company, what Tully first perceived as compliments took on a "weird vibe" for her. Tully Tr. 150: 4-10.

104.    Tully also claims that at the incident after the prospective-client dinner seminar,

_____

[9] Multiple witnesses deny that Cassaday sexually harassed them or that they witnessed Cassaday harassing female employees. Instead, Cassaday would compliment both men and women on their physical fitness. Likewise, others did not perceive Cassaday's "I love redheads" comments to be lewd and sexual in nature, but, instead, found this habit a personal affectation and endearing. *See* Butler Decl. at ¶¶ 10-11; Yu Decl. at ¶¶ 4-5, 7; Mouser Decl. at ¶¶ 4-7; Ex. 19, Declaration of Chelsea Miller ¶¶ 5-7; Ex. 20, Declaration of Michele Tigani ("Tigani Decl.") ¶¶ 4-7. Former employees Yu and Butler affirm they have no concerns recommending Cassaday & Company as a workplace to women.  Butler Decl. ¶ 4; Yu Decl. ¶ 7.

where Cassaday suggested going for a ride, a "light bulb went off" and then she took the comments as "flirtations" and then as "suggestive in nature." Tully Tr. 150: 11-17.

105.    Tully does not recall if this incident occurred in the summer or late fall of 2016 or 2017. Tully Tr. 150: 18-22; 151: 1-5.

106.    Tully admits that during her employment with the company she regularly told Cassaday she appreciated him as a boss and that she sent him a lot of emails to that effect. Tully Tr. 157: 2-8.

107.    For example, Tully testified that when she wrote in an email to Cassaday on April 1, 2016 saying, "Thank you so much, Steve – you treat us so well!" she meant it. Tully Tr. 158:15-22, 159: 1-4; Ex. 21, Apr. 1, 2016 Tully email to Cassaday.

108.    As another example, Tully testified that when she wrote an email to Cassaday on February 27, 2017 saying, "It's an honor and a privilege to work here for you" she meant it. Tully Tr. 160: 1-12; Ex. 22, Feb. 27, 2017 Tully email to Cassaday.

109.    As another example, Tully also testified that when she wrote an email to Cassaday on August 29, 2016 that it was "pretty damn cool" to work for him, she meant it. Tully Tr. 164: 5-19; Ex. 23, Aug. 29, 2016 Tully email to Cassaday.

110.    Stephan Cassaday is known for saying he "loves redheads." Mouser Decl. ¶ 6; Tigani Decl. ¶ 6; Felix Decl. ¶ 57.  For example, he regularly tells prospective clients at seminars that any redhead gets a discount.[10]  Tigani Decl. ¶ 6.

111.    Tully also claims that Cassaday frequently told her he loved redheads and that he would think about her hair. Tully Tr. 147: 22; 148: 1-2.

112.    Tully never told Cassaday that his comments about loving redheads or about her

---

[10] Cassaday had a daughter who, tragically, died as a child.  She had red hair and his quirk is in her memory.  Cassaday Decl. ¶ 11.

red hair offended her. She also never asked him to stop. Tully Tr. 167: 15-21.

113.    Tully also admits that she joked with Cassaday in emails about his professed affinity for redheads. Tully Tr. 167:22; 168: 1-3.

**Tully Resigns from Cassaday & Company**

114.    In late March or early April, Stewart opened a discussion with Tully about whether the Trading Administrators should have Series 7 licenses, or whether their reliance on instructions from a trading program preset by investment advisors and the client made them functionally "wire operators." Am. Compl. ¶¶ 28, 32.

115.    The debate about what Tully called a "gray area" continued for some weeks and eventually came to Cassaday's direct attention on May 30, 2018 when Tully—without first consulting with Stewart, Felix or Cassaday—instructed the Trading Administrators to cease placing trades. *See* Am. Compl. ¶¶ 33-40.

116.    On Friday June 8, 2018 Tully and Cassaday met about these matters. Cassaday acknowledged that the company was considering whether to terminate Tully's employment. *See* Am. Compl. ¶ 40. For her part, Tully reported to friends: "I offered my resignation just now." Ex. 24, Tully Facebook correspondence with Mark Fallon and Heather Leed Neary ("Facebook Cor.") at Tully0001442.

117.    However, by the end of the June 8 meeting they had agreed to move forward. Tully Tr. 55: 3-22; 56: 1-15; 57: 1-8; Ex. 25, Transcript of June 11, 2019 Meeting ("June 11 Tr.") 4: 20-25; 5: 1-2. *See also* Cassaday Decl. ¶¶ 5-6.

118.    Between Friday and Sunday, Cassaday and Felix exchanged email communications regarding Tully's compliance concern and her continued employment. Cassaday informed Felix that he was not going to terminate Tully's employment and would, instead, work with her. Felix Decl. ¶ 59, Ex. W, June 8-10, 2018 email exchange between Felix

and Cassaday; Cassaday Decl. ¶¶ 5-6, Ex. A (same).

119.    Over that weekend, Tully and her husband agreed she should resign.  Tully Tr. 57: 9-13; June 11 Tr. 4:22-25-5:1-2; Ex. 26, Tully's Resignation Letter; Facebook Cor. at Tully0001439.

120.    Tully admits that on the morning of June 11, 2018 she asked to meet with Cassaday and Felix.  During this meeting, she both resigned verbally, stating "I think it's probably in both our interests, best interests, that I no longer work at the firm."[11] and delivered a written resignation letter to Cassaday and Felix. Tully Tr. 26: 9-18 and June 11 Tr. 3:4-5 (verbal); Tully Tr. 11:17-22, 12: 1-15 and Tully's Resignation Letter (written).

121.    Tully testified that when she wrote the following in her resignation letter, "I believe it is in the firm's and my best interests that we part ways, and thus I am formally submitting my resignation," she was informing Cassaday and Felix that she was ending her employment with the firm. Tully Tr. 25: 12-19.

122.    Tully testified that by stating in her resignation letter, "If agreed to, I am offering to stay employed and continue trading while Chris and Mike work to attain their trading licenses" and "Upon passing the Series 7, I will transition my responsibilities […] and exit the firm," she was offering to stay for a time so as not leave the firm "in the lurch" by an abrupt departure. Tully Tr. 25: 20-22; 26: 1-8.

123.    Immediately following the June 11 meeting, Tully wrote this to her friends via Facebook: "Resigned."  Facebook Cor. at Tully0001438.

124.    Tully testified that she was resigning "in part" to protect herself over her compliance concerns. Tully Tr. 28: 7-17.

---

[11] Tully surreptitiously recorded the June 11 meeting with her cell phone. Tully Tr. 12: 19-22; 13:1-3.  Defendant had a transcript of the recording prepared for this litigation for the audio file Tully produced.  *See* June 11 Tr.  Tully agrees that the transcript is accurate. Tully Tr. 14: 11-15.

125. Cassaday and Felix knew they were going to accept the resignation without a transition plan but paused a few days to assess matters. Felix Decl. ¶ 61; Cassaday Decl. ¶ 7.

126. On June 14, 2018, Cassaday gave Tully a letter accepting her resignation, effective immediately. Ex. 27, Letter Accepting Resignation; Cassaday Decl. ¶ 7.

**Tully Contends She Was Terminated from Cassaday & Company in Retaliation for Raising Compliance Concerns, not for Complaining of Discrimination**

127. Tully claims that she was terminated by Cassaday & Company for raising a compliance concern, the details of which are outlined in her Amended Complaint. Am. Compl. ¶¶ 27-49; Tully Tr. 53: 5-9.

128. Tully explained the substance behind her belief by stating: "After I raised the concerns and was told to reinstate the traders, it eventually led to being told that I'm not a director, I don't have authority. Linda Stewart was then told to have authority over me. And following that, in meetings with Steve, I saw the outline for the case for my dismissal from the firm because of these incidents, I guess you could say, for lack of a better word. Steve told me that because of all of this he had lost his faith in me, did not believe I had the ability to do the job that I was hired to do, and felt that it was best that I leave the firm." Tully Tr. 53: 10-22; 54: 1-15.

129. Tully believed and continues to believe that she was retaliated against for raising a securities compliance question. Tully Tr. 57: 20-22; 58: 1-16.

130. Tully admits that her sworn EEOC charge that was her predicate for this lawsuit reports that she was fired by Cassaday in retaliation for reporting a securities compliance issue. Tully Tr. 63: 2-13.

131. Tully confirmed that her Amended Complaint states her belief that she was fired for blowing the whistle on compliance issues and for not reinstating the traders. Tully Tr. 66: 15-22; 67: 1-16.

132.    Tully confirmed that this remains her belief. Tully Tr. 68: 3-8.

**Tully Was Planning to Resign Long before Her June 8 Meeting with Stephan Cassaday**

133.    During this time, Tully engaged in regular and extensive group Facebook correspondence with Mark Fallon and Heather Leed Neary, individuals she characterized as "mentors." Tully testified that the set of Facebook correspondence she produced in discovery is an accurate depiction of her correspondence with them. *See* Tully Tr. 15: 11-22; 16: 1-21.

134.    Between April 10, 2017-June 13, 2018, Tully had an extensive, ongoing Facebook conversation with her "mentors" Fallon and Neary regarding her continuing search for other employment and plans to resign from Cassaday & Company.[12]

135.    Tully testified that she did not make things up about her intentions to her "mentors" instead of telling them the truth. Tully Tr. 32: 6-13.

136.    Among many others that are similar, the ongoing conversation included the following statements and exchanges:[13]

- Yes, the LinkedIn is freshened up and I'm cleaning up my resume.
  - April 10, 2017, 9:45pm, Bates – Tully0001554
- *From Mark Fallon:* You know you're leaving. It's just about timing.
  - April 12, 2018, 12:31pm, Bates – Tully0001485
- And yes, I can walk away today.
  - April 12, 2018, 12:33pm, Bates – Tully0001485
- I'm also inclined to file away the email and incident and focus on the exit plan I'm mapping out on paper as I type this.
  - April 20, 2018, 11:23am, Bates – Tully0001147
- Done and done. Thank you both. I spent the flight writing out my exit plan and have options 1 through 5 (with pros and cons) listed. I have a timeline with steps for exiting the firm as well as steps for option 1.
  - April 20, 2018, 3:05pm, Bates – Tully0001146-Tully0001147

---

[12] A compendium of this aspect of the correspondence is appended as a composite Exhibit. *See* Facebook Cor. (Ex. 24).  The two-month period leading to Tully's resignation fills most of four pages.

[13] Unless otherwise indicated, the comment is by Tully.

- I'm stuck. I know what I need to say but whenever I used issue [sic] I walked into my Chief Operating Officer's office prepared to walk out of the firm and never come back again. Frankly I feel like I'm talking to myself right now because I think I know exactly what I need to do.
  - May 10, 2018, 9:30pm, Bates – Tully0001479
- I had my say and will keep working on my exit
  - May 25, 2018, 8:42pm, Bates – Tully0001457
- He recommends whistle blowing if they fire me at this point. I'll still go even if I end up resigning (before being fired....still not staying here)
  - June 8, 2018, 1:19pm, Bates – Tully0001440
- After a lot of thought and speaking extensively with Sean and my attorney, I'm resigning tomorrow and will try to negotiate a transition (the firm still needs me to train until my team gets licensed) and an exit package.
  - June 10, 2018, 7:39am, Bates – Tully0001439
- *From Mark Fallon:* Have everything written up. The resignation letter with the plan, and the second resignation letter that says goodbye.
  - June 10, 2018, 7:55am, Bates – Tully0001438
- My 2 resignation letters are written
  - June 10, 2018, 12:00pm, Bates – Tully0001434
- I just want out.
  - June 10, 2018, 2:39pm, Bates – Tully0001429
- *From Heather Leed Neary:* Did you resign? What did the CEO say?
  - June 11, 2018, 10:15am, Bates – Tully0001138
- Haven't been pulled into the meeting.
  - June 11, 2018, 10:15am, Bates – Tully0001138
- Resigned.
  - June 11, 2018, 11:26am, Bates – Tully0001422
- I don't want a fight. I just want out.
  - June 11, 2018, 4:26pm, Bates – Tully0001416
- Believe me, though…I just want OUT
  - June 13, 2018, 9:08pm, Bates – Tully0001407

137. Tully admits she had a telephone job interview with a trading firm in Chicago scheduled for June 13, 2018. Tully Tr. 33: 17-22; 34: 1-2.

138. Tully testified that she had been looking for a new job since at least December 2017. Tully Tr. 35: 5-7. *See also* Ex. 28, February 22, 2018 Tully email to Kristen Tischler (reporting she remains "on the prowl for a 'big trading desk'").

## III.   <u>ARGUMENT</u>

### A.    **Summary Judgment Standard**

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment "shall" be granted if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified this does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material fact*." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

The movant must support its factual position by citing to particular portions of the record, such as the discovery and disclosure materials on file, and any affidavits or declarations. *See* Fed. R. Civ. P. 56(c). "A party opposing a properly supported motion … 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to ... the nonmovant, and draw all reasonable inferences in his favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**B.** **No Evidence Supports the Claim that Defendant Terminated Plaintiff because She Complained of Gender Discrimination**

To establish a *prima facie* case of retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), a plaintiff must show that  (1) she engaged in protected activity; (2) she was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action.  *Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006) (internal citations omitted).  "[E]ven if a protected activity and adverse employment action are shown, the employee must satisfy the causation element to establish a *prima facie* retaliation case.

**1.** **Tully Did Not Engage in Protected Activity**

Here, Tully claims that she was terminated in retaliation for requesting that her pay be reevaluated based on male employees receiving raises.  Am. Compl. 68.  However, the undisputed evidence demonstrates Tully did not engage in protected activity.  Employees engage in protected activity when they complain to their superiors of suspected Title VII violations.  *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 543-44 (4th Cir. 2003).  Tully's allegation is that she had a meeting with Cassaday where she questioned Forney's pay *compared to hers as his superior*, nothing more.  She admits she did not link this discussion to gender during the meeting, and admits she never told Cassaday or any manager of the company that she was being discriminated against on the basis of her gender with respect to pay.  Def. Facts ¶¶ 76-81.

From her own testimony, Tully never did more than make a general complaint about perceived unfair treatment.  As the Fourth Circuit has held, "a general complaint of unfair treatment does not translate into a charge of illegal . . .  discrimination." *McNair v. Computer Data Sys., Inc.*, 172 F.3d 863, at *5 (4th Cir. 1999) (unpublished) (quoting *Barber v. CSX Distrib. Servs*., 68 F.3d 694, 702 (3rd Cir. 1995)); *see also Smith v. Va. Hous. Dev. Auth*., 2020 U.S. Dist. LEXIS 18628, at *57 n.25 (E.D. Va. Feb. 4, 2020) (finding that a general complaint

cannot serve as a protected activity when the plaintiff did not put the employer on notice that she was complaining of race discrimination since the plaintiff did not mention race in her verbal complaint); *see also Harris v. Md. House of Corr.*, 209 F. Supp. 2d 565, 570 (D. Md. 2002) (finding that plaintiff could not proceed with her retaliation claim because she had "merely complained of the unfair manner in which her superiors had treated her" and had not "protested discrimination or otherwise engaged in activity protected by Title VII").

### 2. Tully Did Not Suffer an Adverse Action; She Voluntarily Resigned

A plaintiff alleging retaliation must show she suffered an adverse action due to her protected activity. Even if Tully could somehow demonstrate that she engaged in protected activity (which she cannot), Tully did not suffer an adverse employment action because she voluntarily resigned her employment.

Specifically, Tully first offered her resignation on Friday, June 8, 2018 when she and Cassaday met to further discuss her concerns about whether the Trading Administrators needed to be licensed. Def. Facts ¶ 116. However, by the end of the meeting, they agreed to move forward. Def. Facts ¶ 117. That weekend, when Felix and Cassaday discussed over email Tully's compliance concern and her continued employment, Cassaday informed Felix that he was ***not*** going to terminate Tully's employment but would, instead, work with her. Def. Facts ¶ 118.

Over that same weekend, Tully and her husband had agreed it would be best for Tully to resign. Def. Facts ¶ 119. The record of Tully's own contemporaneous writings documents she told others she planned to resign and drafted a letter of resignation. She asked to meet with Cassaday and Felix, then told them she was resigning and delivered her letter of resignation. Immediately after the meeting, she wrote to friends to report "Resigned." Def. Facts ¶ 123.

Because the undisputed facts clearly demonstrate that Tully voluntarily resigned her employment, no adverse employment action occurred.

### 3. Tully Cannot Meet Her Ultimate Burden to Show "but for" Causation

An employee making a retaliation claim under Title VII "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer, and not merely a motivating factor." *EEOC v. A.C. Widenhouse, Inc.*, 2014 U.S. App. LEXIS 11874, *4 (4th Cir. 2014) (internal citation and quotation marks omitted).

For all of these reasons, Plaintiff cannot prove by the facts in the record that retaliation for complaining of gender disparity in pay was the "but for" cause of an alleged termination. In addition, Tully does not believe this herself. As Tully wrote and has steadfastly maintained throughout this proceeding, she believes she was terminated from her employment in retaliation for raising securities compliance concerns and instructing the Trading Administrators not to place trades. Def. Facts ¶¶ 127, and 129-132. If so, then *by her own account* the "but for" cause was voicing her concerns over a compliance question. Her claim fails for lack of causation.

### C. Tully Cannot Establish Her Equal Pay Act Claim

Tully claims Defendant discriminated against her in violation of the Equal Pay Act ("EPA"). (Am. Compl. ¶¶ 75-77). To state a *prima facie* case for wage discrimination under the EPA, Tully must show that (1) Defendant paid higher wages to an employee of the opposite sex; (2) that employee performed equal work on jobs requiring equal skill, effort, and responsibility (3) under similar working conditions. *EEOC v. Md. Ins. Admin.*, 879 F.3d 114, 120 (4th Cir. 2018). "The plaintiff creates a presumption of discrimination under the EPA when she establishes a *prima facie* case." *Id.* at 119. Although equal work and similar working conditions are two distinct conditions, the Fourth Circuit typically analyzes them together. *See, e.g., id.* at 122 ("Instead, as we have explained, at this initial stage we ask only whether the claimants and the identified comparators worked jobs requiring 'equal skill, effort, and responsibility,' and whether each claimant was paid less than one or more comparators." (omitting independent

analysis of this third prong)); *Spencer v. Va. State Univ.*, 919 F.3d 199, 203 (4th Cir. 2019) (same).

"Equality under the [EPA] is a demanding threshold requirement. It requires a comparator to have performed work virtually identical (or the apparent synonym, 'substantially equal') to the plaintiff's in skill, effort, and responsibility." *Spencer*, 919 F.3d at 203 (internal quotations omitted). "Congress chose the word 'equal' over the word 'comparable' in order to show that the jobs involved should be virtually identical, that is ... very much alike or closely related to each other." *Wheatley v. Wicomico County.*, 390 F.3d 328, 333 (4th Cir. 2004) (internal quotation marks and citations omitted).

An employer may rebut an EPA claim by showing that the pay differential at issue is "based on a other factor other than sex." 29 U.S.C. § 206(d)(1)(iv); *Spencer*, 919 F.3d at 206. Such factors include an employee's superior relevant experience. *Brinkley v. Harbour Rec. Club*, 180 F.3d 598, 615 (4th Cir. 1999).

In *Brinkley*, the plaintiff had served as the General Manager of the defendant's golf club. The plaintiff alleged the defendant had violated the EPA by paying a male employee more to perform the same job. *See id.* at 605. The male employee had served as a General Manager at prior clubs and had eleven years of country club management experience. In contrast, the plaintiff had not served as a General Manager and had no prior country club experience. The lower court entered judgment for the defendant, finding that the defendant had shown the pay differential was based upon factors other than sex, including the male employee's "superior experience." *Id.* The Fourth Circuit affirmed, explaining:

> The evidence presented by HRC points clearly to only one conclusion -- that HRC and Paschal followed procedures that are standard in the employment marketplace. HRC reviewed a resume and salary history, assessed its financial situation, . . . and negotiated with Paschal to reach a mutually satisfying agreement

as to an appropriate salary. The evidence indicates that HRC reached this agreement on the basis of Paschal's individual merits, not on the basis of his sex.

*Id.* at 615; *see also Kess v. Mun. Employees Credit Union of Baltimore, Inc*., 319 F. Supp. 2d 637, 645 (D. Md. 2004) (granting summary judgment for defendant on pay discrimination claim, because comparators undisputedly had greater management experience than plaintiff).

Tully cannot establish her EPA claim for multiple reasons. To start, she has no male comparator. There was no precedent for Tully's pay and position when she was hired and while she was employed because no one held the same or a virtually identical job during her tenure or as her predecessor. Def. Facts ¶¶ 28-30, 65. Her intended role when hired was to *establish* a Trading Department, then run it, a new and different function at Cassaday & Company. *Id*.

Nonetheless in her Complaint Tully lists Chris Forney as a comparator, alleging he was paid more than she was paid. Am. Compl. ¶ 19. In her answers to interrogatories, Tully reiterates that Forney was paid more and adds Stephen McFeely as a comparator paid more than she was paid; by her deposition testimony she adds Mike Fiorese as a comparator on the basis that he was paid a higher starting salary than she had been paid when hired 3 1/3 years earlier. *See* Def. Facts ¶ 55; Tully Tr. 83: 5-16. *See also* Ex. 12, Plaintiff's Answers to Interrogatories 15, 20 and 21. None is a viable comparator under the EPA.

As to Forney, Plaintiff is simply wrong. He was always paid less than she was paid, as she has now finally conceded during her deposition. Def. Facts ¶¶ 14, 69-70.

As to Fiorese, because of the time difference his starting salary and Plaintiff's make for an apples-and-oranges comparison not a true comparison. By the time Fiorese was hired 3 1/3 years later, as Tully concedes, BP-based compensation across the board (including hers) had risen from the success of the company's business model leading to increased revenue. Def. Facts ¶ 75. This is a "factor other than sex." That said, the real comparison is the number of basis

points awarded.  At the time of her hire, Tully was awarded ▮ BPs, which was the same as the BP awards then held by the two Directors who were her co-managers, one a male and one a female.  Def. Facts ¶¶ 14, 33-34.  Fiorese's award of ▮ basis points was the same as the ▮ basis points awarded to Forney when he was hired into the same role after Tully, but by then amounted to a higher dollar figure due to the increased value of BPs over time.  In other words, when hired Tully was given a salary the same as that of some other directors, even though she was not yet in that role, while Fiorese was given a salary that was the functional equivalent of that awarded upon hire to his peer, Forney.  By an apples-to-apples comparison of basis points, Tully was always paid 18% more than Fiorese (▮ BPs to ▮ BPs).  As she admits, at the point he was hired she was on track to earn 35% more than Fiorese's starting salary for 2018 ($▮▮▮ versus $▮▮▮).  *See* Def. Facts ¶¶ 22, 71-72.  In sum, Fiorese also was compensated less than Tully.

As to McFeely, Tully concedes that his job as Director of Research was not "virtually identical" to the job of Director of Trading. Def. Facts ¶¶ 60-61.  She is correct.  *See* Def. Facts ¶¶ 30, 56.  Even if the jobs were virtually identical, and they aren't, his superior qualifications and experience made for a legitimate reason, other than sex, to pay him more than Tully. In this case, Cassaday took McFeely's education and other qualifications (MBA, CFA, and over 20 years of industry experience) into consideration when setting his pay. Def. Facts ¶¶ 57, 66.  As compared to McFeely, Tully only had a bachelor's degree and 9 years of industry experience at the time of McFeely's hire. Def. Facts ¶¶ 9, 30, 57, 59. Moreover, Tully concedes that McFeely had better qualifications and more experience than she did.  Def. Facts ¶¶ 58-59.

Based on the foregoing undisputed facts, no rational jury could conclude that Cassaday & Company discriminated against Tully in violation of the EPA and her claim should be dismissed.

### D. Tully Cannot Establish Her Claim under Title VII for Pay Discrimination Based on Gender

Title VII prohibits an employer from discriminating "against any individual with respect to [her] compensation … because of such individual's … sex." 42 U.S.C. § 2000e-2(a)(1). Unlike the EPA, Title VII requires proof of intentional discrimination. *Spencer,* 919 F.3d at 207. A plaintiff may show such intent either through direct or circumstantial evidence, or through the burden-shifting framework set out by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *Spencer,* 919 F.3d at 207. While this analysis shifts the burden of production between the parties, the burden of persuasion rests with the plaintiff throughout. *Md. Ins. Admin.,* 879 F.3d at 119.

The *McDonnell-Douglas* framework first requires Tully to state a *prima facie* case for discrimination under Title VII. "The burden of establishing a *prima facie* case of disparate treatment is not onerous." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981). Here, Tully must show that (1) she is a member of a protected class; (2) she was performing her job satisfactorily, (3) an adverse employment action occurred, and (4) the circumstances suggest an unlawfully discriminatory motive. *Bing v. Brivo Sys.,* 959 F.3d 605, 616 n.8 (4th Cir. 2020) (internal citations and quotations omitted). Where, as here, the *prima facie* case of wage discrimination is based on comparators, "[t]he plaintiff may establish a *prima facie* case by demonstrating that she is female, i.e., a member of a protected class, and that the job she occupied was similar to higher paying jobs occupied by males." *Brinkley-Obu v. Hughes Training, Inc.,* 36 F.3d 336, 343 (4th Cir. 1994); *Spencer,* 919 F.3d at 207. Compared to the EPA, Title VII has "a relaxed standard of similarity between male and female-occupied jobs...." *Brinkley-Obu,* 36 F.3d at 343 (internal alterations and citations omitted).

"While Title VII's 'similarity' requirement demands less of plaintiffs than the Equal Pay

Act's 'equality' requirement, it is not toothless: the plaintiff must provide evidence that the proposed comparators are not just similar in *some* respects, but similarly situated *in all respects.*" *Spencer,* 919 F.3d at 207 (quoting *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992)). "While there is no bright-line rule for what makes two jobs "similar" under Title VII, courts consider "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Spencer,* 919 F.3d at 207 (quoting *Bio v. Fed. Express Corp.,* 424 F.3d 593, 597 (7th Cir. 2005)).

As a preliminary matter, Tully cannot meet all of the elements of her *prima facie* case of discrimination. Specifically, she cannot demonstrate that she was subjected to an adverse employment action because the job she occupied was similar to higher paying jobs occupied by males. The undisputed facts do not support this claim. As discussed in the preceding section, Forney, Fiorese and McFeely are not proper comparators because they were paid less than Tully (Forney and Fiorese) or their job and job qualifications were are not similar "in all respects" to Tully's job as Director of Trading (McFeely).[14] As to McFeely, Tully herself admitted that her and McFeely's jobs were not similar in *all* respects. Def. Facts ¶ 62. She is correct. *See* Def. Facts ¶¶ 30, 56. McFeely also had nearly twice Tully's industry experience and better credentials, and he focused on the "research side" while Tully focused on the "trading side." Def. Facts ¶¶ 57-59, 64. They were not similar in qualifications and aptitude, and their positions were not similar in *many* respects.

---

[14] Strictly speaking, the *only* comparator named for Plaintiff's Title VII count is Forney. *See* Ex. 12 (Tully's Answer to Interrogatory 20, where she was asked to identify all comparators for the Title VII claim that she was treated more harshly and less favorably than male employees. She named only Forney. Defendant addresses Fiorese and McFeely in an abundance of caution).

Tully also alleges more broadly, and without being able to identify a single specific instance of actual disparate treatment, that men were treated more favorably with respect to pay and raises. *See* Am. Compl. ¶¶ 54-56. The indisputable record in this case documents that there is no disparate treatment at Cassaday & Company. In addition to the foregoing discussions in this section and the prior section, the most relevant facts are these.

At the time Tully was hired (2015), she was paid the same as the two director-level employees who supervised her (█ BPs), even though she would not herself be named a director and report to another more senior manager for another year. One of her co-managers is male (Butler) and the other is female (Paradiso).[15] Def. Facts ¶¶ 14, 33-34. As well, Tully was paid the salary she requested. Def. Facts ¶ 12.

At the time Tully was hired (2015), another male director (Chad Cassaday) was also paid at █ BPs, and another female director (Mouser) was paid at █ BPs. Def. Facts ¶¶ 37, 39.

In August 2016, Mouser "made her case" for an increase to █ BPs (and later to █ BPs). Def. Facts ¶¶ 40-41. Chad Cassaday, Butler, McFeely, Paradiso and Tully all remained at the same BP level (█) for the duration of the time Tully's employment overlapped theirs. Def. Facts ¶¶ 14, 33-35, 37, 44-45. In other words, during that period increases in BP awards were uncommon for all, but certainly available for a woman who made her case. In contrast, Tully concedes she never undertook to make a case for herself. Def. Facts ¶ 26.

It is untrue that women never got BP increases upon promotion during Tully's tenure. One female former employee Tully has identified as a witness she may call at trial to support her claims—Michelle Montpetit—testified that during her tenure she was twice promoted and each time received an increase in BPs. Def. Facts ¶ 42. Similarly, current female managers of

---

[15] To be clear, Defendant does not consider any of the other director positions discussed herein to be "similar" to Tully's position as Director of Trading. The point is that an objective reviewer could not possibly discern pay disparity from a survey of "director" level employees.

Cassaday & Company confirm that their own female subordinates are awarded increases in BPs. *See* Tigani Decl. ¶ 8; Mouser Decl. ¶ 8. Sarah Mouser got an increase when she went from being co-director of her department to sole director and her responsibilities increased. *Id*. ¶ 9.

The fact that one male director—McFeely—was paid more than Plaintiff (and also more than Chad Cassaday) also amounts to nothing. McFeely was the highest paid male director of Tully's tenure (and the only one paid more than she was paid). The three highest paid directors were all female: Carmen Bississo, Linda Stewart, and Ann Wagaman. Def. Facts ¶¶ 48, 50, 52, and 54. McFeely was paid 12-20% less than Bississo, Stewart, and Wagaman. *Compare* Exs. L, M, N, O, P to Felix Decl. (IRS Forms W-2 for McFeely, Bississo, Stewart, and Wagaman showing total annual wage income).

Plaintiff's claim under Title VII for disparate pay due to gender has no support in the record and should be dismissed.

**E. Defendant Is Entitled to Summary Judgment on Tully's Hostile Work Environment Claim**

To prevail on a sexual harassment claim, Tully must prove: (1) she was harassed because of her sex; (2) the harassment was unwelcome; (3) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) some basis exists for imputing liability to Defendant. *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 241 (4th Cir. 2000).

**1. The Alleged Harassment Was Not Sufficiently "Severe or Pervasive"**

To state a claim of sexual harassment under Title VII, Tully must show that the allegedly harassing conduct was "sufficiently severe or pervasive to alter the conditions of [her] employment and create a hostile or abusive work environment." *Byers v. HSBC Fin. Corp*., 416 F. Supp. 2d 424, 434 (E.D. Va. 2006) (citations omitted). To determine if the alleged conduct satisfies this standard, courts must consider factors such as (1) the frequency of the conduct; (2)

its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct reasonably interfered with the employee's work performance. *Ocheltree v. Scollon Prods., Inc.,* 335 F.3d 325, 331 (4th Cir. 2003).

To be actionable, "conduct must be extreme." *Faragher v. City of Boca Rotan*, 524 U.S. 775, 788 (1998). Courts regularly grant summary judgment in favor of an employer "even when the alleged conduct clearly was inappropriate in some regard" because "'Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace.'" *Harris v. Forklift Sys., Inc*., 510 U.S. 17, 21-22 (1993).

Tully cannot show that the alleged harassing conduct was sufficiently severe or pervasive to sustain a sexual harassment/hostile work environment claim. Here, Tully admits that there were just two "larger incidents" over 3½ years that she found lewd and offensive: once when, after a prospective-client dinner seminar, Cassaday told her and Kristen Tischler he wanted to "take them for a ride" in his car, and another when he touched her hair. Def. Facts ¶¶ 95, 97-98.

Cassaday's lesser allegedly harassing conduct was that he would frequently comment on her looks and legs; ask Tully to spin around in order to look at her hair; compliment her about her fitness and how "good [she] looked" and, at times, stopped other employees to have them take a look at her, too. Def. Facts ¶¶ 99-100. Tully also claims that Cassaday frequently told her he loves redheads and that he would think about her hair. Def. Facts ¶ 111.

Under well-established decisional authority as set out above and as follows, this type of conduct, even if all these incidents were wholly true, is not sufficiently severe or pervasive to sustain a sexual harassment/hostile work environment claim. None of this alleged conduct was "extreme." Tully admits that none of what she described regarding Cassaday's alleged behavior and comments was physically threatening to her. Def. Facts ¶ 94. Tully does not claim that Cassaday ever propositioned her, showed her obscene materials, or groped her. *See generally*

Def. Facts ¶¶ 95-100, 111. Furthermore, Tully admits that she never told Cassaday that his comments and behavior offended her and that he should stop, and she never complained about them. Def. Facts ¶¶ 87, 93, 112. Tully also admitted that commenting on athleticism and working out is not offensive in the proper context. Def. Facts ¶ 101. Furthermore, it took a full year (at least) before Tully began to perceive comments she first perceived as compliments as "flirtations" and then as "suggestive in nature." Def. Facts ¶¶ 103-104. Moreover, Tully testified that if others heard Cassaday's comments as compliments (and they did, *see* footnote 9), then it was a matter of perception. Def. Facts ¶ 102.

When deposed, Tully admitted that she praised Cassaday repeatedly for being a good boss, told him she was proud to work for him and joked with him in emails about his professed affinity for redheads. Def. Facts ¶¶ 106-109, 113. Moreover, Tully does not claim that Cassaday's alleged behavior damaged her ability to do her job. *See generally* Def. Facts ¶¶ 93-94, 103, 106, 112-113. In fact, Tully proposed remaining at Cassaday & Company for an indefinite period of time after resigning. Def. Facts ¶ 122. Furthermore, the record demonstrates Tully conducted a job search due to management differences and her desire to run a "big trading desk", *not* because of any alleged hostile work environment. Def. Facts ¶¶ 134-135, 137-138.

In sum, these undisputed facts reveal that Tully cannot even come close to meeting the high bar of demonstrating a hostile work environment. Ultimately, the behavior Tully describes as offensive is more comparable to the kind of offhand comments that courts have rejected as insufficiently severe or pervasive to constitute actionable sexual harassment:

- no hostile work environment where assistant warden commented on a daily basis that plaintiff should be "spanked," stared at female employee's breasts when he spoke to her, told her she looked "real good," made references to his physical fitness, and remarked

that if his wife was as attractive as plaintiff, he would not permit her to work in a prison — *Singleton v. Dep't of Corr. Educ.,* 115 Fed. Appx. 119 (4th Cir. 2004).

- no hostile work environment where female employee alleged that her direct supervisor asked her whether she was married or dating, loudly and crudely described his pre-marital and marital sexual exploits to her despite her pleas to him to stop, engaged in animated episodes of red-faced bullying, yelling, and insulting remarks that were directed at her and threatened to beat her like a dog — *Cox v. Rumsfeld*, 369 F. Supp. 2d 748, 752-53 (E.D. Va. 2005).

- no hostile work environment based on allegations that supervisor propositioned employee while discussing her salary, requested she massage his nude buttocks, asked if she had strong fingers, suggested she should date his son, leered at her, and made comments about her appearance — *Moret v. Geren,* 494 F. Supp. 2d 329, 342 (D. Md. 2007).

Because Tully cannot show that the alleged harassing conduct was sufficiently severe or pervasive, her discrimination claim for a hostile work environment claim should be dismissed.

## 2. Under the Faragher-Ellerth Defense, Cassaday & Company Is Not Liable for Sexual Harassment

The *Faragher-Ellerth* defense is an affirmative defense that an employer may assert to protect itself from liability for an employee's sexual harassment claims. *Faragher*, 524 U.S. at 807; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). This defense is only available in circumstances where: (1) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; (2) the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise; and (3) the employer did not take a tangible employment action against the employee, or took a tangible employment action for a non-discriminatory reason. *Lissau v.*

*Southern Food Service, Inc.*, 159 F.3d 177, 182 (4th Cir. 1998).

### a. Cassaday & Company Exercised Reasonable Care to Prevent and Correct Sexual Harassment

With regard to the first element of the defense, the Fourth Circuit has stated: "Our cases have held that dissemination of 'an effective anti-harassment policy provides compelling proof' that an employer has exercised reasonable care to prevent and correct . . . harassment." *Matvia v. Bald Head Island Mgmt.,* 259 F.3d 261, 268 (4th Cir. 2001); *see also Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 266 (4th Cir. 2001) ("Distribution of an anti-harassment policy provides 'compelling proof' that the company exercised reasonable care in preventing and promptly correcting harassment."); *accord Lissau*, 159 F.3d at 182. Cassaday & Company satisfied that element, because it is undisputed that the firm distributes, and Tully received, a "Prohibition Against Sexual and Other Unlawful Harassment" Policy with a complaint reporting procedure. Def. Facts ¶¶ 88-89.

### b. Tully Did Not Invoke Cassaday & Company's Harassment Reporting and Open Door Policies to Report Conduct She Now Says Was Harassment

When an employee fails to take advantage of its employer's anti-harassment policy by complaining internally, the employee cannot maintain a claim for harassment. In *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 266-67 (4th Cir. 2001), the Fourth Circuit affirmed the lower court's dismissal of an employee's sexual harassment claim because the employer had distributed an anti-harassment policy and the employee failed to follow the policy and complain about the alleged harassment. The *Barrett* court explained that the existence of an anti-harassment policy is "compelling proof" that the company exercised reasonable care in preventing and promptly correcting harassment. *Barrett,* 240 F.3d at 266. Any evidence that an employee failed to utilize the company's complaint procedure "will normally suffice to satisfy [the company's] burden under the second element of the [*Faragher-Ellerth*] defense." *Id*. at 267.

Tully signed an acknowledgement of receipt of the firm's employment manual, which contained the policy. Def. Facts ¶ 89. Tully agreed that the acknowledgment form stated she was responsible to review the manual. Def. Facts ¶ 90. Tully also confirmed that she read and understood the manual. *Id.* Tully was also aware of Cassaday's and Felix's open door policies and reminded her own staff of it on August 24, 2016. Def. Facts ¶ 91. Further, Tully testified that she offered to file a complaint on behalf of Flora Yu regarding an alleged sexually demeaning statement by Cassaday. Def. Facts ¶ 92.

Despite Tully's knowledge of both the Policy and Cassaday's and Felix's open door policies, Tully admits that she never reported any of the comments she now alleges that Cassaday made to any Cassaday & Company managers during her employment. Def. Facts ¶ 87. Instead, Cassaday & Company first became aware of her claim after she was no longer employed by the firm. *See* Def. Facts ¶ 87, 93, 112. Because Tully failed to take advantage of Cassaday & Company's policies by complaining internally, Tully cannot maintain a claim of harassment.

### c. Cassaday & Company Is Not Liable for Tully's Sexual Harassment Claim because She Resigned Her Employment

The *Faragher-Ellerth* defense is available to an employer that did not take a tangible employment action against an employee. *Lissau*, 159 F.3d at 182. As reviewed in Section III.B., the indisputable evidence documents that Tully was not terminated but, instead, resigned her employment. Because Cassaday & Company did not take a tangible employment action against Tully, Cassaday & Company may successfully assert the *Faragher-Ellerth* defense and is not liable for Tully's sexual harassment claim.

## IV.   **CONCLUSION**

For the forgoing reasons, Cassaday & Company respectfully requests that the Court grant its Motion in full and enter judgment against Tully on all claims.

July 31, 2020

Respectfully submitted,

/s/ Joseph E. Schuler
Joseph E. Schuler (VSB # 73997)
Linda U. Okoukoni (VSB # 80773)
JACKSON LEWIS PC
10701 Parkridge Boulevard, Suite 300
Reston, VA  20191
(703) 483-8300
schulerj@jacksonlewis.com
linda.okoukoni@jacksonlewis.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of July, 2020 the foregoing *Defendant's Memorandum in Support of Motion for Summary Judgment* with accompanying Appendix of Exhibits was served on Plaintiff's counsel by the Court's ECF system and electronic mail:

R. Scott Oswald, Esq.
Kellee Boulais Kruse, Esq.
The Employment Law Group, P.C.
888 17th Street, NW
9th Floor
Washington, DC  20006

*Counsel for Plaintiff*

/s/ Joseph E. Schuler
Joseph E. Schuler